## APPEAL OF BLACKSTONE MANUFACTURING CO.

Docket No. 4899.   Promulgated October 6, 1927.

Evidence does not establish a value of water rights paid in for stock at March 5, 1841, in excess of that allowed by the Commissioner as a factor of invested capital.

*Harry P. Cross, Esq.*, and *J. Robert Sherrod, Esq.*, for the petitioner.

*J. Arthur Adams, Esq.*, for the Commissioner.

The Commissioner has asserted a deficiency of $11,708.28 in income and profits taxes for the year 1918, arising from the disallowance of the petitioner's claim for paid-in surplus on account of certain water rights acquired by it in 1841.

### FINDINGS OF FACT.

1. The petitioner is a corporation organized and chartered in 1841 under the laws of Rhode Island. Its incorporators were the members of the Blackstone Manufacturing Co., a partnership, formed in 1808. It purchased all the property belonging to the partnership, paying therefor to the shareholders of the firm a total of 200 shares of stock having a par value of $1,500 each. Its principal office is located at Providence, R. I. At all times after its organization until a date subsequent to December 31, 1918, it was engaged in the manufacture and sale of cotton cloth.

2. Its manufacturing plant was at all times on the Blackstone River some 20 miles above Providence. The river is nonnavigable. The raw material was carried from the seaboard to the factory via the Blackstone Canal, and the manufactured goods were shipped by the same route until railway communication was established some years subsequent to 1841.

3. Until 1870 water was the sole motive power used in the factories. From 1870 until 1917, water and steam power were both used. In 1917 steam was discarded and electrical power has since been used to supplement the water power.

4. The business was established in 1808–1809 by the Blackstone Manufacturing Co. The dam was constructed near the state line in Massachusetts, where it remained until a comparatively recent date, when a new dam was built a short distance down the river in Rhode Island, and the old one discarded. The mills are on both sides of the state line.

5. In 1841 the actual fall used by the partnership at the dam was 28¼ feet, and the fall controlled by and belonging to the company was about 32 feet.

6. The number of spindles in use prior to 1841 was 16,000, and the number of looms 325. . In 1841 a second mill was constructed containing 10,000 spindles and 187 looms, and, in 1845, a third mill containing 10,000 spindles and 206 looms. No change is shown to have been made in the dam or race during these four years.

7. The yearly production of cloth, insofar as is material, was as follows:

|  | Yards per week. |
|---|---|
| 1840 | 3, 184, 622 |
| 1841 | 3, 381, 581 |
| 1842 | 3, 840, 540 |
| 1847 | 150, 000 |

8. About one-fourth mile below the Blackstone Manufacturing Co.'s dam there was, in 1841, the Farnum dam. The owners of the latter had secured their water-power rights from the Blackstone Canal Co., the relation of which to the petitioner is not disclosed and is not material to the issues involved in this proceeding. It was found that this dam was not high enough to give the owners of the Farnum dam the power they needed. They could not increase its height without the permission of the Blackstone Manufacturing Co. They bought from such company for $5,000, the right to increase the height of their dam 7½ inches, and to maintain it at that height so long as the Farnums and their assigns could, under their agreement with the Canal Company, legally keep the dam at the height it then was.

9. According to its charter the stock of the Blackstone Manufacturing Co. could "not exceed $500,000; to be divided into 200

shares." The company at a meeting of its incorporators held at its counting room Friday, March 5, 1841, passed the following resolutions:

*Voted*, that the 200 shares of the stock in this corporation be divided amongst the owners in the firm of the Blackstone Manufacturing Company in proportion to the interest owned by each in the property of said firm————.

*Voted*, that an assessment of 1500 Dollars on each share of the stock of this Company be called and made payable this day————.

*Voted*, that this corporation purchase from the partners in the firm of the Blackstone Manufacturing Company, the whole of the property of the said firm of every kind and description subject to the debts due by said Company for the sum of 300,000 Dollars and that payment of the same be made to the owners in the said firm by issuing to them certificates of shares in the Capital Stock of this Company on which the receipt of payment of 1500 Dollars per share is acknowledged————.

10. The property of the partnership was held in common. It was divided into 200 shares, each partner owning a stated number. When a partner sold any of his property in the company, he described it in his deed as so many shares. There are in evidence five such deeds of sale as follows:

| Date | Number of shares | Total price | Price per share |
|---|---|---|---|
| June 19, 1813 | 16⅔ | $18,000 | $1,080.00 |
| May 24, 1814 | 4 | *3,875 | 968.75 |
| May 24, 1814 | 4 | 6,800 | 1,700.00 |
| Mar. 11, 1826 | 16⅓ | 18,000 | 1,102.04 |
| Mar. 2, 1829 | 16⅓ | 26,000 | 1,591.84 |
| July 13, 1840 | 16⅓ | 24,000 | 1,469.39 |

The sales of June 19, 1813, May 24, 1814, and March 2, 1829, were to outsiders. The sales of March 11, 1826, and July 13, 1840, were between partners.

11. Petitioner's Exhibit No. 8 contains inventories of the property of the Blackstone Manufacturing Co. from January 1, 1828, to January 1, 1842. Preceding the inventory for January 1, 1828, the properties are enumerated in detail and the value of each stated. The value of the "Water Privilege" as given is $3,000, and the total value of all other property, except cash and amounts due on account and notes, $283,922.92.

The balance for subsequent years is in part as follows:

January 1, 1830 —————————————————————————— $335,549.94
        1, 1832 —————————————————————————— 420,178.62
        1, 1834 —————————————————————————— 372,478.95
        1, 1836 —————————————————————————— 305,454.94
        1, 1938 —————————————————————————— 415,264.14
        1, 1840 —————————————————————————— 395,421.47
        1, 1841 —————————————————————————— 367,499.84

The balance as of January 1, 1841, represents the net assets of the petitioner after deducting the amount of $60,000 distributed to the partners on February 1, 1841.

12. In its income and profits-tax return for 1918, the petitioner claimed invested capital as follows: Capital Stock, $900,000; surplus, $732,279.30; reserve for taxes $50,000, or a total of $1,682,279.30. Upon audit of such return the Commissioner disallowed the claim of the petitioner for water rights, thereby reducing surplus in the amount of $145,279.30.

OPINION.

LANSDON: This appeal presents two issues for our consideration: (1) Whether the Commissioner erroneously reduced the petitioner's invested capital by the amount of Federal taxes accrued for the prior year, prorated for that part of the taxable year remaining after such taxes became due and payable, and (2) whether the petitioner may include in its statutory invested capital, as paid-in surplus, the alleged cash value of certain assets for which it exchanged its capital stock in the amount of $300,000, par value at date of its incorporation in 1841.

Our decision on the first issue is against the petitioner. Section 1207, Revenue Act of 1926; *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

The second issue is largely one of fact. The petitioner asserts that the property which it received in 1841 in exchange for its stock of the par value of $300,000 had a cash value at that date in excess of the par value of such stock and asks that such excess cash value shall be included in the computation of its statutory invested capital for the taxable year. Section 326(a) provides, " That as used in this title ' invested capital ' means    *    *    *    (2) Actual cash value of tangible property, other than cash, *bona fide* paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus."

The petitioner corporation is the successor of a partnership of closely related individuals which was formed in 1808. Participation in the partnership was measured by the ownership of units or shares of the nominal value of $1,500 each. Upon incorporation each partner received one share of stock for each unit of his interest in the partnership. During the period from 1808 to 1841, there were several sales of partnership units at prices ranging from $968.75 to $1,700. The transactions involving the highest and the lowest prices

were in 1814, and in each case was between partners and outsiders. In 1829, 16⅓ units were sold to outsiders at $1,591.84. In 1840 there was an intra-partnership sale of 16⅔ units at $1,500 per unit.

The balance sheet of the partnership at January 1, 1841, discloses net tangible assets in the amount of $367,492.84 after the deduction of $60,000 to be distributed to the partners at February 1 of that year. The balance sheets as of January 1, 1836, 1838, and 1840, disclose net tangible asset balances in the respective amounts of $385,454.94, $415,264.14, and $395,421.47. The ancient documents in evidence disclose net operating profits of the partnership and the petitioner for the years 1839, 1840, 1841, and 1842, in the respective amounts of $30,553.35, $46,026.78, $52,487.15, and $53,487.05. The petitioner offers these figures to support its claim that the tangible assets paid in to the petitioner in 1841 had a value substantially in excess of the par value of the stock issued therefor. To our minds they merely indicate the apparent prosperity of the partnership and the petitioner about the date involved and have very slight probative value as to the question at issue. The evidence is taken from ancient documents that were properly identified as business records of the partnership and corporation, but was not confirmed or supported by proof of many essential facts. We know nothing of the methods of accounting that resulted in such figures. There may have been no deductions from income or asset values on account of depreciation. Deductions for expenses are unknown either as to nature or amount. We have no knowledge of the capital contributions of the various partners. Since the partnership had been very successful for about 30 years prior to the date of these statements, a considerable part of the net earnings may have resulted from good will used in the business.

In 1841 one Welcome Farnum owned a power site, a power plant, and a dam with a head of about 4½ feet on the Blackstone River one-fourth of a mile below the property of the petitioner. On August 16, 1841, the petitioner sold to Farnum, for $5,000, the right to raise his dam 7½ inches. It is contended that if 7½ inches of head in the Blackstone River at that time and place was worth $5,000, the head of 28.25 feet owned and used by the petitioner had a value directly in proportion to that amount, or approximately $226,000. That a head of 28.25 feet of water has potential energy proportional to one of 7½ inches is a physical fact that can not be controverted without disregarding the law of gravitation. That it has value in the same proportion depends on so many conditions that the physical fact, unsupported by other evidence, has little evidentiary weight. The Commissioner points out that there is no evidence that the petitioner parted with any water power in this trans-

action, and that, inasmuch as it owned the riparian lands between the two power plants, the payment may have been for overflow damages resulting from raising the lower dam. He insists that in any event the price that Farnum was willing to pay for 7½ inches of additional head at his power site for undisclosed purposes in connection with the operation of his property can not be regarded as a true measure for determining the value of the petitioner's head of 28.25 feet some distance up stream. This is sound reasoning. We are of the opinion that the Farnum sale does not prove the value of the petitioner's water privileges and rights in the amount for which it contends.

In further support of its contention the petitioner introduced and qualified a witness expert in the valuation of water privileges and rights. This witness, reasoning from the terms and conditions set forth in the deed to Farnum, was of the opinion that the power privileges in question had a value of $150,000 in 1841. He arrived at this conclusion by a mathematical computation resulting in a maximum value of $226,000, based on the $5,000 paid by Farnum for 7½ inches of head, and then decreased such result by making allowances for the possible relatively greater value of a small part than of the whole, and for such part of the payment as may have been consideration for flooding the riparian lands of the petitioner. This witness also testified that he had worked out the cost of installing and operating a theoretical steam plant in 1841 with horse power equal to that of the petitioner's water-power plant, and that, by comparison of the theoretical steam plant with the petitioner's water-power rights and privileges, he was of the opinion that the latter had a value of $145,858.80 at the date it was paid in to the corporation. Obviously such a computation involves many unknown factors and the result obtained can be no more than an approximation. We are without the facts required to confirm and verify this approximation. We do not know the unit of power cost in 1841 of either a steam or water-power plant on the Blackstone River, at the time of the reorganization here involved. We do not know the relative cost of maintaining and operating such plants. If the alleged capital value is allowed, we do not know whether the power plant in question was operated at a saving as compared with a steam plant of equal capacity.

It appears from the testimony, and from the laws and decisions which we have consulted that the petitioner's water privileges and rights emerged from its ownership of land on both sides of the Blackstone River, and of the riparian rights appertaining thereto. The Commissioner has accepted the petitioner's valuation of its riparian lands as a factor of its invested capital. The petitioner

has not proved that it received water power of the value alleged separable from other riparian rights in exchange for stock in 1841.

Reviewed by the Board.

> *Judgment will be entered for the Commissioner.*